**Entered on Docket**
**June 13, 2012**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

JUN 0 9 2012

United States Bankruptcy Court
San Jose, California

## UNITED STATES BANKRUPTCY COURT

### NORTHERN DISTRICT OF CALIFORNIA

In re                                    ] Case No. 05-50662-ASW
                                         ]
AMR MOHSEN,                              ]
                                         ] Chapter 7
                  Debtor.               ]
                                         ]

### MEMORANDUM DECISION REGARDING TRUSTEE'S FINAL ACCOUNT; FEE APPLICATION OF TRUSTEE'S ACCOUNTANT; AND FEE APPLICATION OF TRUSTEE'S COUNSEL

Before the Court is the final account of chapter 7 trustee Carol Wu ("Trustee") as well as requests for approval of the first and final fee applications of Trustee's accountant, Kokjer, Pierotti, Maiocco & Duck, LLP ("Accountant"), and Trustee's counsel, Goldberg, Stinnett, Davis & Linchey ("Counsel"). Debtor, Dr. Amr Mohsen ("Debtor"), acting *pro se*, and Debtor's former chapter 11 counsel, David Levin, Esq. ("Attorney Levin") both object to the fee applications of Accountant and Counsel. Attorney Levin further objects to Trustee's fee application.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Factual Background

The following factual summary provides an overview of this bankruptcy case to provide context for the pending fee applications. Additional facts pertaining to the various objections to the fee applications are set forth below as necessary to the discussion of a specific objection.

1    Debtor, who has a PhD. in electrical engineering and applied science, is the founder, former

2  chairman and CEO of Aptix Corporation ("Aptix"), a high-tech company. In the late 1990s, Aptix

3  sued a rival company for patent infringement in federal district court. After the district court found

4  that Debtor had engaged in the falsification and fabrication of evidence, a judgment of more than four

5  million dollars was entered against Aptix.

6    In March 2003, the United States Attorney charged Debtor with various criminal offenses,

7  including perjury and falsification of evidence, arising out of the Aptix patent litigation. In March

8  2004, Debtor was incarcerated pending trial on those charges and remains incarcerated through the

9  present day due to Debtor's January 2007 conviction.

10    In April 2004, just after Debtor entered prison, Aptix filed a voluntary chapter 11 bankruptcy

11  petition. Aptix's assets were sold, and the case converted to chapter 7. In March 2006, the Aptix

12  bankruptcy was closed. Due to foreclosure proceedings against Debtor's home in Los Gatos,

13  California, on February 8, 2005, Debtor also filed this individual chapter 11 case. Washington

14  Mutual Bank and Silicon Valley Bank, the holders of the 1st and 2nd deeds of trust on Debtor's home,

15  quickly sought relief from stay to continue foreclose proceedings against Debtor's residence. Debtor

16  opposed relief. On June 29, 2005, following an evidentiary hearing, the Hon. James R. Grube granted

17  Silicon Valley Bank relief from stay effective October 1, 2005, which provided Debtor with ninety

18  days to sell his home.

19    In July and August 2005, Debtor filed two adversary proceedings. In the first, Debtor sought

20  damages from Polytex Corporation ("Polytex") related to the return of three oriental rugs. The second

21  action sought recovery of insurance proceeds from State Farm Fire and Casualty Company ("State

22  Farm") related to fire damage that Debtor's residence had sustained sometime before Debtor filed for

23  bankruptcy relief.

24    After Debtor failed to locate a buyer within the time that the bankruptcy court had allotted,

25  Debtor lost his home to foreclosure. With the estate's main asset gone, the United States Trustee

26  ("UST") moved to convert Debtor's case from chapter 11 to chapter 7, and Debtor filed a competing

27  motion to dismiss the case. In December 2005, following a combined hearing on both motions, Judge

28  Grube ordered the case converted to chapter 7 and denied Debtor's motion to dismiss. Trustee was

1    appointed on December 22, 2005.  The court approved appointment of Counsel on January 12, 2006

2    and of Accountant on January 26, 2006.  Since conversion to chapter 7, Debtor has represented

3    himself.

4          Almost immediately, Trustee and Counsel began to investigate what assets existed that

5    might be recoverable for the estate.  In January 2006, Trustee sought and obtained permission to

6    conduct Rule 2004 examinations of Attorney Levin and Debtor's son, Ehab Mohsen, who was acting

7    as Debtor's attorney-in-fact.  On March 20, 2006, Trustee filed an adversary proceeding to object to

8    Debtor's discharge, which will be discussed in more detail below.  On May 31, 2006, Trustee filed a

9    motion to disqualify Attorney Levin as Debtor's counsel based on an asserted conflict of interest and

10   to require Attorney Levin to disgorge any fees received from Debtor's estate.  Following Judge

11   Grube's retirement, the Hon. Roger L. Efremsky heard and denied the motion to disqualify but

12   directed Attorney Levin to disgorge $4,480 in fees received in connection with representing a

13   company that Debtor owned, which claimed an interest in certain funds held by Debtor's estate.  In

14   September 2006, Trustee filed a second adversary proceeding that sought a judicial declaration that

15   assets of three entities that Debtor controlled constituted property of Debtor's estate.

16         In Spring 2007, after completing an investigation into the merits of the two adversary

17   proceedings that Debtor had filed during the chapter 11 case, Trustee moved to abandon the suit

18   against Polytex and to compromise the suit against State Farm.  The motion to abandon was

19   unopposed and granted.  Judge Efremsky approved the compromise with State Farm over Debtor's

20   opposition.  On appeal, the bankruptcy appellate panel upheld the court's approval of the

21   compromise.

22         In Fall 2010, this case was re-assigned to the Hon. Stephen L. Johnson, but Judge Johnson

23   recused himself due to previous involvement with Mohsen's criminal matters while Judge Johnson

24   was an Assistant United States Attorney.  As a result, in Spring 2011, this case was re-assigned to this

25   Court.  The case remains open, and Debtor has not yet received a discharge.

26

27

28

## I.    **TRUSTEE'S FINAL ACCOUNT AND REQUEST FOR COMPENSATION**

Under § 326 of the Bankruptcy Code, the Court may allow a trustee reasonable compensation for services rendered, not to exceed a statutory maximum calculated based on a percentage of the trustee's distributions to parties in interest. 11 U.S.C. § 326(a). Trustee seeks reimbursement of $67.95 in expenses, plus approval of $12,669.09 in fees, which is the statutory maximum based on total distributions of $188,381.82. Trustee's application covers services performed between December 22, 2005 and September 30, 2011.

Attorney Levin objects to awarding the Trustee any compensation because Trustee's statutory fee is based entirely on distributions to Trustee's professionals. Relying on a district court decision in *In re Testaverde*, 317 B.R. 51 (E.D.N.Y. 2004), Attorney Levin argues that distributions to professionals do not qualify as distributions to "parties in interest" for the purpose of calculating Trustee's commission under § 326(a). Trustee responds that courts have universally rejected or ignored the *Testaverde* decision and, by way of example, points to *In re Kohl*, 421 B.R. 115 (Bankr. S.D.N.Y. 2009)(Glenn, J.); *In re Vona*, 333 B.R. 191 (Bankr. E.D.N.Y. 2005)(Bernstein, J.); and *In re Nardelli*, 327 B.R. 488 (Bankr. M.D. Fla. 2005)(Jennemann, J.). Trustee further asserts that the local practice in courts throughout the Northern District of California, including this Court, is to allow trustees to include distributions to professionals for purposes of calculating a trustee's commission. Trustee urges this court not to alter local practice based on non-binding authority from the Eastern District of New York.

In *Testaverde*, a district court affirmed a bankruptcy judge's decision to exclude payments to the trustee's legal counsel from the amount of distributions used to calculate the maximum commission that the trustee could receive. The district court reasoned that Congress had changed the language in § 326 to limit the type of distributions on which trustees' compensation is based. Previously, § 326 had included distributions to "any persons" for purposes of calculating trustee compensation, but the statute now provides that compensation is based on the distributions to "parties in interest." The *Testaverde* court concluded that a trustee's professionals are not "parties in interest" because they do not have pecuniary interests that are directly affected by the bankruptcy case. *Testaverde*, 317 B.R. at 55-56.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Subsequently, the bankruptcy court in *Kohl*, following the analysis of the *Vona* court,

2 reached the opposite conclusion. As the *Kohl* court explained:

3    The court in *Vona* looked to the language of the statute surrounding the term
"parties in interest" and the interplay of sections of the Bankruptcy Code to

4    demonstrate that the attorney's fees and other administrative claims should be
included when calculating a trustee's commission. By including the word

5    "including" in the statute, the court reasoned that Congress intended a broad
interpretation of the statute and not one cabined to the dictionary definition of

6    "parties in interest." The court noted that section 726 of the Code requires a trustee
to make distributions from the estate in priority order, including distributions to the

7    trustee's professionals. Under this logic, a trustee's professionals clearly have an
interest in the distributions from an estate, as they are second in line to be paid

8    from the liquidation of the estate. Thus, for purposes of section 326 they should be
considered parties in interest and distributions to these entities should be included

9    when calculating the trustee's commission.

10 *Kohl*, 421 B.R. at 130 (internal citations omitted).

11    The Court has reviewed the district court decision in *Testaverde* as well as the cases cited by

12 Trustee and finds the analysis in *Vona* and *Kohl* to be more persuasive. There is no reasoned basis for

13 distinguishing between distributions to pay other administrative expenses, which are included as part

14 of Trustee's commission calculation, and distributions to pay the trustee's professional fees, which

15 under *Testaverde*, are not. Trustee's professionals have a pecuniary interest in the bankruptcy estate

16 to the same extent as any other administrative claimant. Accordingly, Attorney Levin's objection to

17 Trustee's fee application is overruled.

18

19 **II.    ACCOUNTANT'S FEE APPLICATION**

20    Accountant seeks an award of $36,562.00 in fees and $115.62 in expenses for services

21 performed during the period from January 19, 2006 through June 2, 2011. Both Debtor and Attorney

22 Levin object to Accountant's request.

23    First, Debtor asks the Court to limit Accountant's fees to $2,642 – the amount incurred for

24 preparing the bankruptcy estate's tax returns. Debtor argues that the January 26, 2006 order

25 approving Accountant's employment ("Employment Order") specifically limited Accountant's work

26 to tax return preparation. The plain language of the Employment Order, however, makes it clear that

27 it relates to more than tax return preparation. The Employment Order states that Accountant is

28 authorized to perform "accounting services on a general basis, and specifically for services to be

1  rendered to advise the Trustee regarding the preparation of the bankruptcy estate's tax returns." *See*

2  Employment Order at page 2, line 1, Docket No. 169]. In light of the specific reference to tax returns,

3  the additional reference to "accounting services on a general basis" is clearly intended to include

4  something more than tax return preparation. The Court finds that the Employment Order does not

5  limit Accountant's authorized tasks to the filing of post-conversion tax returns for the bankruptcy

6  estate. Debtor's objection on this basis is overruled.

7  Second, Debtor asserts that if the Accountant's services include preparing Debtor's tax

8  returns for pre-bankruptcy tax years 2001-2004, those services should be denied as unnecessary

9  because Debtor previously had a different accountant prepare the income tax returns for those years.

10  The declaration of Richard Pierotti ("Pierotti Declaration"), one of Accountant's principals, attests

11  that Accountant did not request fees for tax return preparation related to pre-bankruptcy tax years.

12  Debtor's objection on this basis is overruled as moot. Pierotti Supp. Decl. dated Nov. 10, 2011 at ¶ 4.

13  Next, both Attorney Levin and Debtor object to $15,208.50 in fees that Accountant requests

14  for a forensic accounting related to certain entities and accounts that Debtor owned or controlled pre-

15  petition. By way of background, Debtor's bankruptcy schedules, as amended in June 2005, show that

16  Debtor owned or controlled several distinct entities. Debtor was the founder and majority shareholder

17  of Aptix and was the managing member of Advanced Investment Management, LLC ("AIM LLC"), a

18  Delaware Limited Liability Company that Debtor formed in May 2001. Debtor also owned and

19  controlled Advanced Information Management, Inc. ("AIM Inc."), a technology company formed

20  under Egyptian law that did business in Egypt from 2001 to 2005. Hereafter, AIM LLC and AIM Inc.

21  collectively will be referred to as "the AIM Entities." Additionally, Debtor held title to certain family

22  assets through a revocable family trust, known as Star Trust, that Debtor established in 1982. Star

23  Trust was revoked in early 2005, shortly after Debtor filed this bankruptcy case. Also, between 2001-

24  2004, Debtor maintained over a dozen Morgan Stanley brokerage accounts. The accounts were held

25  in the names of Debtor, Star Trust, AIM LLC, Debtor's children and Debtor's sister.

26  As set forth in the Pierotti Declaration, Debtor failed to maintain adequate books and records

27  for AIM LLC as well as the Star Trust. Moreover, a substantial number of transfers occurred between

28  brokerage accounts of the AIM LLC, Debtor and Debtor's family. As a result, Trustee could not

1  determine whether the AIM Entities or Star Trust held assets that could be recovered for the benefit of

2  Debtor's creditors. Trustee asked Accountant to look into the pre-petition financial transactions

3  among these entities.

4  Debtor objects to the fees related to Accountant's investigation because, Debtor asserts,

5  Accountant was never authorized to perform work for the AIM Entities or Star Trust. Contrary to

6  Debtor's assertions, however, the evidence indicates that the forensic accounting was not performed

7  for the benefit of the AIM Entities or Star Trust. Rather, the forensic accounting services were

8  performed on behalf of Trustee and were necessary to determine if assets existed that could be

9  recovered for the benefit of Debtor's creditors. This basis for Debtor's objection is overruled.

10  Attorney Levin argues that the fees incurred for the forensic accounting were not necessary

11  to the administration of the bankruptcy estate because, before any forensic work was required,

12  Trustee, in a separate adversary proceeding, obtained a default judgment finding that the AIM Entities

13  were Debtor's alter ego and that the AIM Entities' assets were part of Debtor's estate. Even if the

14  work was necessary, Attorney Levin asserts that Accountant should have scaled back the investigation

15  because the recovery for the estate was only $90,407 and spending $15,208 to investigate was

16  unreasonable.

17  Under Bankruptcy Code § 330, an applicant's services are compensable if those services

18  were "necessary ... or beneficial at the time at which the service was rendered," and an applicant's

19  services are not compensable to the extent that applicant's services were not "reasonably likely to

20  benefit the debtor's estate." 11 U.S.C. § 330(a)(3)(A), (C) and (a)(4)(A)(ii)(I). To meet this standard,

21  an applicant need only demonstrate that the services provided were "reasonably likely" to benefit the

22  estate *at the time the services were rendered*. *In re Mednet*, 251 B.R. 103, 108 (9th Cir. B.A.P. 2000).

23  Attorney Levin's assertion that a June 13, 2007 default judgment in Trustee's favor rendered

24  the forensic accounting unnecessary is not convincing. Accountant incurred the fees related to the

25  forensic accounting between January 31, 2006 and January 21, 2007. *See* Time Summaries attached

26  to Accountant's Application for Compensation, Docket No. 320. The default judgment did not exist

27  until several months after the forensic accounting was complete.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Additionally, the fees related to the forensic report survive a cost/benefit analysis. Attorney Levin acknowledges that the forensic review resulted in Trustee obtaining a default judgment against the AIM Entities worth approximately $90,000 to Debtor's estate – $22,400 related to AIM Inc.'s claim in the Aptix bankruptcy and $68,407 related to AIM LLC's investment interest in Get2chip.com, a company that subsequently merged with Cadence Design Systems ("Cadence"). The Court does not find that spending $15,208 to uncover $90,407 in assets – a cost of approximately 16% of the recovery – is unreasonable. Moreover, under *Mednet*, the relevant question is whether the services were reasonably likely to benefit to the bankruptcy estate *at the time that the services were rendered. Id*. As Counsel and Accountant explained in declarations, Debtor's pre-petition wealth, Debtor's history of deceit and the absence of adequate records raised significant concerns as to whether substantial assets might be hidden. *See* Pierotti Supp. Decl. dated Nov. 10, 2011 at ¶ 6; Davis Decl. dated Apr. 23, 2012 at ¶ 3. Trustee was entitled to test the validity of those concerns. The amount of assets at issue could not be known until the forensic accounting was completed. Pierotti Supp. Decl. dated Nov. 10, 2011 at ¶ 6. Looking forward, the forensic accounting was reasonably likely to benefit the estate.

A review of Accountant's specific time entries further confirms that Accountant's fees related to the forensic accounting were both reasonable and necessary. Between January 31, 2006 and March 24, 2006, Accountant spent approximately 31 hours, incurring fees of $9,641 to analyze 21 Morgan Stanley brokerage accounts over a four year period. As part of this analysis, Accountant examined the funding of AIM LLC, records regarding private equity investments, records regarding partnership investments and the various transfers between the brokerage accounts and other family investments. In light of the complexity of Debtor's affairs, these hours are reasonable. In August 2006, after Counsel received documents subpoenaed from Bank of America, Accountant incurred another $4,265.50 in fees to reconcile the information received from Bank of America with the information regarding the 21 Mortgage Stanley accounts. This work led to Trustee's complaint against the AIM Entities filed in September 2006. Thereafter, Accountant incurred only small amounts related to Accountant's forensic work: $434 on October 5, 2006 to trace partnership distributions into personal accounts and $868 in January 2007 to review additional financial records

and brokerage statements. Based on an analysis of Accountant's time records, the Court finds that the forensic accounting substantially contributed to the Trustee's action against the AIM Entities and Star Trust and, as a result, the related fees were reasonably likely to benefit to the bankruptcy estate at the time that the services were rendered and should be allowed in full. The objections of both Debtor and Attorney Levin related to the forensic accounting are overruled.

Debtor next contends that all of Accountant's services were complete on February 26, 2007 when Accountant filed what Debtor characterizes as a "work completion report." Debtor argues that all subsequent work unrelated to tax return preparation was unauthorized. This argument lacks merit. The February 26, 2007 report is an expert report that Accountant prepared in connection with Trustee's adversary proceeding to deny Debtor's discharge. The report does not constitute evidence that Accountant's work had been completed or that Accountant's services had ended. Debtor's objection on this basis is overruled.

Finally, Attorney Levin contends that fees of $9,462 that Accountant incurred to prepare an expert report in support of Trustee's complaint objecting to Debtor's discharge were neither necessary nor beneficial to the bankruptcy estate. The Court will address this contention below, together with the analysis of Counsel's fees related to the same complaint objecting to Debtor's discharge.

## III.  COUNSEL'S FEE APPLICATION

Counsel asks the Court to approve fees in the total amount of $134,128.50 and expenses in the amount of $11,172.73 for the period December 27, 2005 through March 8, 2011. Debtor and Attorney Levin object to fees related to several specific project categories. Each project category is addressed separately below.

### A.  *Motion to Disqualify Attorney Levin*

Counsel seeks approval of $14,574 in fees incurred in connection with Trustee's motion to disqualify Attorney Levin ("DQ Motion"). Attorney Levin objects and asks the Court to disallow all but $1,493 associated with this project category. In support of his objection, Attorney Levin asserts that the DQ Motion was unnecessary because 1) the UST could have challenged Attorney Levin's

1 qualification to serve as Debtor's counsel but did not, and 2) Trustee could have administered the

2 chapter 7 estate without filing the DQ Motion. Attorney Levin further contends that the fees

3 associated with the DQ Motion did not benefit the estate because the requested $14,574 in fees led to

4 a recovery of only $4,480 for the estate. Levin proposes that Counsel's fees in this category be

5 limited to one third of the value recovered.

6       In reviewing the necessity and reasonableness of fees, courts consider the nature, extent and

7 value of the professional's services. 11 U.S.C. § 330(a)(3)(A). This standard does not require an

8 applicant to show that the services resulted in a material benefit to the estate before compensation is

9 appropriate. *Mednet*, 251 B.R. at 108. Rather, as previously discussed, the applicant need only

10 demonstrate that the services were "reasonably likely" to benefit the estate at the time the services

11 were rendered. *Id.*

12       Additional facts considered by the Court are as follows: Soon after Trustee's appointment,

13 Counsel reviewed emails exchanged between the UST's office and Attorney Levin where the UST

14 expressed concern that Attorney Levin was acting on behalf of both Debtor and AIM Inc. As a result,

15 in January 2006, when Attorney Levin filed his second fee application, seeking $37,912 in fees – in

16 addition to $47,135 Attorney Levin had been paid with respect to Attorney Levin's first fee

17 application – Trustee objected by asserting, in part, that Trustee was investigating whether Attorney

18 Levin had an undisclosed conflict of interest that would disqualify Attorney Levin from receiving

19 compensation. On May 31, 2006, Counsel filed Trustee's motion to disqualify Attorney Levin.

20 Trustee contended that in seeking approval of employment, Attorney Levin had misrepresented his

21 disinterestedness to the court because in June 2005, Attorney Levin was simultaneously representing

22 Debtor's estate and a conflicting interest of AIM Inc. Specifically, in June 2005, while Attorney

23 Levin was Debtor's chapter 11 counsel, Attorney Levin filed a $51,000 administrative expense claim

24 in the Aptix bankruptcy on behalf of AIM Inc. AIM Inc. and Debtor had competing claims to funds

25 from the Aptix bankruptcy because Debtor had a $97,000 claim against AIM Inc. Ultimately, Aptix

26 and AIM Inc negotiated a compromise of the administrative claim for $24,400. But, to allay the

27 UST's concerns about the conflict of interest between Debtor and AIM Inc., AIM Inc. agreed that any

28 funds from Aptix would be held by Debtor's estate pending a determination of ownership of the

1  funds.  According to the DQ Motion, despite the agreement with the UST, Attorney Levin acted

2  contrary to Debtor's interests by deducting $4,480 from the total transferred to Debtor's estate and

3  transmitting the $4,480 to Attorney Levin's general account as payment under Attorney Levin's

4  contingency fee agreement with AIM Inc.   The DQ Motion requested disqualification of Attorney

5  Levin, denial of all fees requested, and disgorgement of all fees already paid to Attorney Levin.

6       After briefing and oral argument, the bankruptcy court (Judge Efremsky) denied the motion

7  to disqualify because the court was not persuaded that Attorney Levin had intentionally

8  misrepresented the absence of any conflict of interest.  Rather, the court accepted  that Attorney Levin

9  may not have appreciated the extent of the conflict based on Attorney Levin's dual representation of

10  AIM Inc. and Debtor.   While the court did not believe complete disqualification was appropriate, it is

11  plain that the court was concerned about Attorney Levin's representation of both Debtor and AIM Inc.

12  The court expressed hope that Attorney Levin had learned from this experience and understood that,

13  going forward, conflicts must be thoroughly weighed and considered.  The court suggested that

14  Attorney Levin should have worked through the arrangement with his two clients and brought the

15  arrangement to the court's attention before engaging in any further representation.  Ultimately, the

16  court required Attorney Levin to return the $4,480 in funds that Attorney Levin had retained as

17  payment of Attorney Levin's contingency fee for representing AIM Inc.

18       At the time the motion to disqualify was filed, Attorney Levin had already received

19  $47,539.60 in fees and expenses pursuant to Attorney Levin's first interim fee application.

20  Additionally, the Court had approved over $38,000 in fees and expenses pursuant to the second

21  interim application that remained unpaid.  Looking forward, the DQ Motion, if successful, could

22  have recovered over $85,000 for Debtor's estate.  Under that scenario the $14,574 in fees charged by

23  Counsel would not have been unreasonably large – about 17% of the total recovery.  According to

24  Counsel's most recent declaration, at the time the DQ Motion was filed it was difficult to perform a

25  cost-benefit analysis of the DQ Motion because Attorney Levin was not forthcoming with information

26  related to his conflict of interest.  Nevertheless, before the DQ Motion was filed, Trustee had some

27  evidence that Attorney Levin had acted in his own interest and in the interest of AIM Inc. to the

28  detriment of Debtor's estate and that Attorney Levin had failed to fully disclose his connections with

1 AIM Inc. Moreover, the Ninth Circuit has held that, under the Bankruptcy Code and Rules, full

2 disclosure of counsel's connections is strictly construed and is a prerequisite to receipt of

3 compensation. *See, e.g., Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*,

4 63 F.3d 877, 880-81 (9th Cir. 1995). As a result, Counsel and Trustee had reason to believe that the

5 motion to disqualify could reasonably result in a significant recovery for Debtor's estate.

6   Moreover, according to Counsel's supplemental declaration, Trustee and Counsel believed

7 the DQ motion had benefits beyond any potential monetary recovery. Trustee and Counsel wanted to

8 prevent Attorney Levin from using information gained as Debtor's chapter 11 counsel to defeat

9 Trustee's claims against the AIM Entities. *See* Davis Decl. dated Apr. 23, 2012 at ¶ 7.

10   While, ultimately, the DQ Motion only resulted in a $4,480 return for Debtor's estate, at the

11 time the services were rendered, the motion was reasonably likely to benefit Debtor's estate through a

12 significant monetary recovery. It is apparent from Judge Efremsky's comments on the record, that

13 Attorney Levin's representation of both Debtor and AIM may have actually constituted a conflict but

14 that the court was unwilling to disqualify Attorney Levin without further proof that Attorney Levin

15 had understood the extent of the conflict. Based on all of these circumstances and for the reasons

16 explained, the Court finds that Counsel's fees for the motion to disqualify were reasonably likely to

17 benefit to the bankruptcy estate at the time that the services were rendered. Attorney Levin's

18 objection based on necessity and benefit to the estate is overruled.

19   Nevertheless, Counsel's belief that the DQ motion would result in a substantial recovery for

20 the estate did not give Counsel free reign to devote many hours to a project that should have been

21 accomplished in much less time. Attorneys have a duty to exercise good billing judgment when they

22 apply for fees. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Hours that are excessive in relation

23 to the task accomplished are not reasonable and should be excluded from fee applications. *See* 11

24 U.S.C. § 330(a)(3)(D) and (a)(4)(A). In deciding whether time spent is excessive, the court must

25 consider factors such as the skill and experience level of the practitioner, as well as the complexity,

26 importance and nature of the task at hand. *Id.* at § 330 (a)(3)(D) and (E).

27   After reviewing Counsel's time records, the Court concludes that the time spent to research

28 and draft the DQ Motion was excessive. Between April 7, 2006 and May 31, 2006, two attorneys

Memorandum Decision on Final
Account and Fee Applications
12

1  spent nearly 20 hours, incurring $7,820.50 in fees, to prepare and file the DQ Motion. It should be

2  noted that the applicant is a well-known firm in the San Francisco Bay Area, and the primary attorney

3  handling this matter is a seasoned attorney with substantial bankruptcy experience. The primary

4  attorney appears to have been assisted by a fourth or fifth year associate. The DQ Motion, while

5  potentially important, was not particularly complex. The motion included a two page summary of

6  facts and merely five pages of legal argument. The DQ Motion is supported by a two page

7  declaration with multiple exhibits attached. In light of the experience of counsel, the hourly rates

8  charged and the nature of the task at hand, it appears that Counsel allowed an excessive amount of

9  time to be allocated to this project. In light of those factors, the Court concludes that twelve hours of

10  a senior attorney's time should have been more than ample to research and draft the motion, along

11  with the supporting declaration and will reduce Counsel's fees in this project category by $2,200.00.

12

13     **B.**     *Litigation Against Star Trust and the AIM Entities*

14        Counsel further incurred $44,283 in fees for services related to claims that Trustee asserted

15  against Star Trust and the AIM Entities. Attorney Levin asks the Court to reduce the allowable fees

16  to $30,265, and Debtor contends that Counsel should not receive any fees in connection with this

17  litigation.

18        When this case converted to chapter 7, Debtor claimed that $51,000 of the funds from the

19  debtor in possession account that were turned over to Trustee, were held in trust for the AIM Entities.

20  This amount included the amount discussed above received in connection with AIM Inc.'s

21  administrative claim in the Aptix bankruptcy. Counsel assisted Trustee with investigating the

22  ownership of the funds and whether other assets existed that could be recovered. These efforts

23  included reviewing records from various entities and conducting Rule 2004 exams of Attorney Levin

24  and Ehab Mohsen, the trustee of Star Trust. The investigation uncovered $68,407 that Trustee

25  recovered from Cadence, but again Debtor claimed that AIM LLC owned these funds because they

26  represented AIM LLC's investment interest in Cadence.

27        Although Trustee held the funds, Trustee had to file an adversary proceeding against Star

28  Trust and the AIM Entities to determine ownership of the nearly $120,000 in dispute. The complaint,

1   filed September 26, 2006, sought declaratory relief establishing that: (1) all property of Star Trust

2   became property of Debtor's bankruptcy estate upon the post-petition revocation of Star Trust on

3   March 3, 2005; (2) the AIM Entities were alter egos of Debtor; (3) AIM LLC owned an interest in

4   get2chip, Inc., an entity that merged with Cadence, and is now the owner of any distributions due

5   from that merger as well as any resulting stock in Cadence; and (4) all assets of Star Trust and the

6   AIM Entities are assets of the bankruptcy estate.

7           Star Trust answered the complaint, and discovery with Star Trust ensued.  Meanwhile, in

8   January 2007, Attorney Levin, acting as counsel for the AIM Entities, filed a motion asking the court

9   to require Trustee to release $20,000 of the disputed funds so the AIM Entities could retain counsel to

10  defend the adversary proceeding.  Counsel researched and prepared opposition to that motion arguing

11  that there was no evidence suggesting that the AIM Entities had any claim to the funds and that

12  Attorney Levin was representing an adversary of the estate without obtaining Debtor's waiver of that

13  conflict.  The bankruptcy court denied the request to release funds on February 8, 2007.

14          Although Debtor, individually, filed a "response" to Trustee's complaint on behalf of the

15  AIM Entities, which "answered" Trustee's allegations, Trustee moved to strike the answer and to

16  default the AIM Entities because Debtor, who is not an attorney, could not properly appear and act on

17  behalf of the AIM Entities.  Debtor filed a competing motion to dismiss Trustee's complaint or,

18  alternatively, to reconsider the decision not to release funds to retain counsel.  Counsel prepared

19  Trustee's opposition to the motion to dismiss again asserting that Debtor was not authorized to act on

20  behalf of the AIM Entities.  By order of May 8, 2007, the bankruptcy court granted Trustee's motion

21  to strike the answer that Debtor had filed on behalf of the AIM Entities, directed the clerk to enter the

22  default of the AIM Entities, denied Debtor's motion to dismiss for lack of jurisdiction and denied the

23  motion for reconsideration of the request to release funds.   Counsel then prepared a request for entry

24  of default judgment supported by declaration, deposition testimony and other documents establishing

25  grounds for relief.  On June 13, 2007, the court entered a default judgment against both of the AIM

26  Entities.

27          Debtor filed two separate appeals to the bankruptcy appellate panel ("BAP"), one of the

28  Court's May 8, 2007 order and one from the default judgment.  Counsel prepared Trustee's motion to

1   dismiss the appeals. Before the BAP dismissed Debtor's appeals, Debtor filed multiple pleadings

2   with BAP, including a motion to appoint counsel to which Counsel prepared opposition. By the time

3   of the BAP's August 14, 2007 dismissal of the appeal as interlocutory, Counsel had incurred

4   approximately $30,000 in fees related to pre-complaint investigation, preparation of the complaint,

5   prosecution of the adversary proceeding with respect to Star Trust, motion practice with respect to the

6   AIM Entities and defending Debtor's appeals of the bankruptcy court rulings.

7           The closing of the adversary proceeding, following the BAP's dismissal of the appeal, did

8   not deter Debtor. In August 2008, more than a year after the Court entered judgment and eight

9   months after the adversary proceeding was closed, Debtor filed a motion with this Court to set aside

10  the June 13, 2007 default judgment. For the first time, Debtor argued that Debtor had standing to

11  defend against the complaint based on Debtor's status as a manager and/or director of the AIM

12  Entities. Debtor contended that he could be liable to individual shareholders of the AIM Entities and,

13  therefore, had been injured directly and independently when Trustee seized assets of the AIM Entities.

14  On September 23, 2008, Debtor also filed a motion to impose disciplinary sanctions on Counsel for

15  allegedly violating the rules of professional conduct due to inappropriate contact with Debtor's son.

16  Counsel prepared thorough but succinct opposition to both motions explaining Debtor's lack of

17  standing to seek reconsideration, the untimeliness of the requested reconsideration, the absence of any

18  breach of the rules governing professional conduct and the lack of authority to impose the requested

19  sanctions. Thereafter, Debtor sent letters to the court and filed supplemental declarations which

20  necessitated Counsel's preparation of a reply brief. Judge Efremsky heard argument on both of

21  Debtor's motions on January 22, 2009. By written order entered January 26, 2009, the Court denied

22  both motions. Debtor requested reconsideration, and Counsel prepared a short opposition reiterating

23  Debtor's lack of standing. On April 30,2009, Judge Efremsky denied Debtor's motion to reconsider.

24  Counsel devoted approximately $6,000 of time to this post-judgment motion practice.

25          On May 15, 2009, Debtor filed another appeal with the BAP. This time Debtor took issue

26  with Judge Efremsky's orders denying Debtor's motions to set aside the default judgment, to impose

27  sanctions against Counsel and to reconsider the Court's denial of the first two motions. Counsel

28  prepared a motion to dismiss the appeal as untimely, but continued to monitor various motions that

1 Debtor filed with the BAP. In January 2010, the BAP set a briefing schedule. Counsel spent

2 approximately eight hours preparing Trustee's appellee brief and attended a hearing before the BAP.

3 By a memorandum decision filed on December 21, 2010, the BAP affirmed the bankruptcy court's

4 rulings. The Debtor petitioned for re-hearing, but Counsel did not respond to that motion. After re-

5 hearing was denied, Debtor took a further appeal to the Ninth Circuit. Counsel spent less than four

6 hours preparing Trustee's Ninth Circuit brief. The Ninth Circuit appeal remains pending. Counsel

7 has incurred just over $8,000 in fees related to all the appeals of this adversary litigation.

8 Despite the proceedings described above, Attorney Levin argues that $44,283 is excessive

9 because Counsel did little or nothing to collect the funds from Star Trust and the AIM Entities.

10 According to Attorney Levin, Trustee should have closed the bankruptcy estate, rather than keep it

11 open and defend against Debtor's appeals, because the decision to defend merely used up estate funds

12 and did not benefit the estate. Attorney Levin contends that, at most, one third of the value recovered,

13 or $30,265, is the appropriate award under the reasoning of *Unsecured Creditors' Comm. v. Puget*

14 *Sound Plywood, Inc.*, 924 F.2d 955 (9th Cir. 1991). Debtor goes further and contends that no fees

15 should be allowed with respect to the litigation against Star Trust and the AIM Entities. Debtor urges

16 that the work was neither necessary nor reasonably likely to benefit the bankruptcy estate because

17 Debtor was only a shareholder of the AIM Entities and, therefore, the assets recovered did not belong

18 to Debtor or Debtor's estate. Debtor further asserts that, under *Ahcom, Ltd v. Smeding*, 623 F.3d 1248

19 (9th Cir. 2010), California does not recognize the quasi-alter ego cause of action on which Trustee

20 sued the AIM entities. As a result, Debtor urges, Trustee had no standing to sue the AIM Entities, and

21 the Ninth Circuit is likely to reverse the judgment in Trustee's favor.

22 The Court has reviewed the fee application, Counsel's several declarations in support, the

23 several submissions in opposition and the docket in this litigation. Based on that review, the Court

24 finds that with minor exceptions discussed below, the requested fees are reasonable. While judgment

25 was entered by default, the history of this litigation described above, reveals that the default judgment

26 was not easily obtained and, subsequently, had to be defended against multiple attacks both before the

27 bankruptcy court and on appeal. A review of Counsel's filings establish that Counsel made brief but

28

1 thorough arguments. There is no indication that Counsel went beyond what was necessary to defend

2 the default judgment.

3       Moreover, Attorney Levin's reliance on *Puget Sound*, to suggest a one third contingency-

4 type fee, is unpersuasive. In *Puget Sound*, the Ninth Circuit found that it was within the bankruptcy

5 court's discretion to calculate and award $6,172 in fees based on a hypothetical 30% contingency fee

6 rather than the traditional $21,000 lodestar amount. The fees subject to challenge in *Puget Sound*

7 related to work on the unsecured creditor's committee's objection to $120,000 in attorneys' fees paid

8 to a secured creditor. The Ninth Circuit noted that prior to committee counsel's work, the general

9 manager of the committee had advised committee counsel that the fee challenge would not be cost-

10 effective and that the committee did not want to "throw good money after bad." Further, under the

11 relevant loan documents, an award of reasonable attorneys' fees to the secured creditor was

12 mandatory so complete recovery of $120,000 was virtually impossible.

13       Here, there were no similar contraindications to proceeding with Trustee's litigation against

14 Star Trust and the AIM Entities. Without the litigation, the Trustee risked losing the $120,000 that

15 was in dispute because Trustee would not have clear title to the funds. According to Counsel's most

16 recent declaration, without the funds, the estate was immediately insolvent. *See Davis Decl. dated*

17 Apr. 23, 2012 at ¶ 5. Counsel believed the documentation establishing Trustee's claims against the

18 AIM Entities and Star Trust was clear and that the litigation would be straightforward. In Counsel's

19 opinion, this type of litigation was not likely to cost more than $15,000. *Id.* There is no dispute that

20 much of the increased expense arose from Debtor's repeated attempts to reverse the bankruptcy

21 court's finding that the AIM Entities were Debtor's alter egos. Attorney Levin's argument that

22 Counsel should have somehow factored in the cost of Debtor's multiple appeals in performing the

23 initial cost-benefit analysis simply asks for too much hindsight. Counsel cannot be expected to have

24 foreseen that, following a default judgment and the dismissal of the original BAP appeal, Trustee

25 would have to defend yet another motion for reconsideration and two more appeals. Moreover, there

26 is no clear evidence as to whether or when Counsel knew of Debtor's litigious nature, but even if

27 Counsel had been aware, there was little Counsel could do short of abandoning the funds to Debtor, a

28 result that would have been detrimental to the estate. Under these circumstances, there is no basis for

1  imposing a hypothetical contingency fee on Counsel when the parties negotiated, and the court

2  approved, a different fee arrangement.

3          In reviewing Counsel's time records, however, the Court did find several items that merit

4  some reduction in the requested fees.  For example, within this project category, there are time entries

5  totaling approximately 2 hours that represent time spent downloading documents, calendaring

6  deadlines, confirming papers were filed, organizing files, and electronically filing documents.  All of

7  these tasks are non-compensable clerical tasks for which a reduction of $950 is warranted.  Counsel

8  also billed $625 for 2.5 hours on August 3, 2006 to attend a hearing in Debtor's criminal case.  This

9  time does not appear to have any benefit for Debtor's bankruptcy estate and will be disallowed.  The

10  total reduction in this project category is $1,575.

11

12          **C.    *Trustee's Litigation Against State Farm***

13          When Debtor's chapter 11 bankruptcy case was converted to chapter 7, Trustee substituted

14  in as plaintiff in litigation that Debtor filed, post-petition and pre-conversion, against State Farm.  The

15  lawsuit sought recovery of $232,000 in additional insurance coverage that Debtor claimed was owed

16  as a result of substantial pre-petition fire damage to Debtor's residence.  Counsel seeks $29,404 in

17  fees related to this litigation. Attorney Levin objects to the fees because Trustee settled the $232,000

18  claim against State Farm for $30,000 and, after Debtor's $6,075 exemption, the real recovery for the

19  bankruptcy estate is $23,925.  As a result, Attorney Levin again urges that the fee award should be

20  reduced to one third of the value of the asset recovered, or $7,974, under *In re Strand*, 375 F.3d 854,

21  854 (9th Cir. 2004), and *Puget Sound Plywood*.  Debtor goes further and requests that the Court

22  disallow all fees related to the State Farm litigation.  Debtor asserts that incurring over $29,000 in

23  fees to settle Debtor's $418,788 fire insurance claim for $30,000 breached Counsel's duty to exercise

24  billing judgment and, as a result, Counsel should not receive any compensation for this work.

25          When Trustee substituted in as plaintiff, the State Farm litigation was less than four months

26  old.  Although State Farm had filed a general denial of Debtor's allegations, little else had happened.

27  Counsel proceeded to investigate the merits of Debtor's claims through both written discovery and

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  depositions. Ultimately, Counsel concluded that there was no evidence to support Debtor's claim that

2  State Farm owed additional money to Debtor's estate.

3  In response to the Court's inquiry as to when Counsel knew that there was no evidence to

4  support the claim, Counsel explains that this knowledge accumulated over time. *See* Davis Decl.

5  dated Apr. 23, 2012 at ¶ 6. First, Counsel asked Debtor, through Attorney Levin, to turn over all files

6  related to the State Farm litigation. The documents, consisting of 31 pages, suggested only that

7  Debtor had disagreed with State Farm's evaluation of Debtor's losses, and did not directly support

8  Debtor's claims. While this indicated that Debtor had not supplied Attorney Levin with enough

9  evidence, it did not necessarily indicate that no evidence existed. *Id.* Counsel prepared requests for

10 production directed to State Farm, reviewed a box of documents related to Debtor's insurance claim

11 that State Farm produced, and attended the depositions of Debtor and Kip Martin, an adjustor that had

12 represented Debtor in his pre-litigation dealings with State Farm. Based on Counsel's declaration

13 filed in support of the application to approve the State Farm compromise, it appears that the

14 deposition testimony of Mr. Martin on October 3, 2006 was the point where Counsel was relatively

15 certain that there was no available evidence to support the pending claims asserted against State Farm.

16 Up through Mr. Martin's deposition Counsel incurred approximately $8,000 in fees for Counsel's

17 investigation into the merits of the claims. This amount is reasonable in that it included written

18 discovery, document review, appearances at several status conferences, ongoing communications with

19 opposing counsel and Trustee and two lengthy depositions.

20 Over the next four months, Counsel incurred approximately $1,400 negotiating the

21 settlement with State Farm. The time records reflect that this time consists largely of telephonic and

22 email communications with opposing counsel, attendance at court status conferences and multiple

23 communications with Trustee. The time spent negotiating the compromise is not unusually large and

24 appears to be reasonable, especially in light of the fact that it led to a $30,000 settlement in a case

25 where Trustee had no evidence to support the claims.

26 However, the same cannot be said about the time Counsel spent preparing and prosecuting

27 Trustee's application for court approval of the compromise. Counsel's time records reflect that

28 Counsel spent over 15 hours, incurring approximately $5,000 in fees, to draft the application to

1   approve the compromise and a supporting declaration. This amount of time is clearly excessive in

2   relation to the task. The factual summary was repeated virtually word for word in Counsel's

3   supporting declaration. Moreover, the law related to approving compromises is straightforward and

4   well known. There was no need to spend 15 hours drafting a relatively simple application. Next,

5   Counsel incurred $2000 in time spent reviewing and replying to Debtor's opposition to the

6   compromise. Then, after Judge Efremsky overruled Debtor's objections and approved the

7   compromise, Counsel spent over $800 of time drafting a short written order approving the

8   compromise. All in all, Counsel incurred about $9,000 in fees to prosecute an uncomplicated

9   application to approve compromise in a case where Counsel knew that recovery would be limited to

10  $30,000 and where Counsel had already incurred nearly $10,000 in fees investigating the claims and

11  negotiating the settlement. Based on the nature of the task performed and Counsel's level of

12  experience, the Court concludes that $3,000, approximately ten hours of time, should have been

13  sufficient to obtain an order approving the compromise. The Court disallows $6,000 of the requested

14  fees as excessive in relation to the task performed.

15          Debtor appealed the order approving the compromise to the BAP. The BAP affirmed the

16  bankruptcy court on March 6, 2008 in a thirteen page decision, which found that the bankruptcy court

17  had made appropriate findings of fact and weighed the four required factors set out in *Woodson v.*

18  *Firman's Fund Insur. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988), that those findings of

19  fact were not clearly erroneous, that the bankruptcy court had not ignored Debtor's objections to the

20  compromise, that it was not an abuse of discretion to find the compromise fair and equitable, and that

21  the bankruptcy court did not improperly shift the burden of proof onto Debtor. The Debtor appealed

22  again to the Ninth Circuit , which affirmed the BAP based on a *de novo* review. Counsel incurred

23  about $5,000 in fees representing Trustee in each of Debtor's two appeals. In most cases, a charge of

24  $5,000 for an appeal would not be out of the ordinary. Here, however, Counsel knew the limits of

25  recovery and the amount Counsel had already billed to this project category. As a result, with respect

26  to the time billed to the BAP appeal, the Court will reduce fees by $1,200, which represents

27  miscellaneous time reviewing various orders, notices and motions to which Trustee had no need to

28

respond. For the same reasons, the Court reduces the fees associated with the Ninth Circuit appeal by $900.

In light of the above analysis, Attorney Levin's plea to limit Counsel's fees to one third of the State Farm settlement's net proceeds to the estate is denied. Counsel performed actual and necessary services to investigate and settle the adversary proceeding. The mere fact that Trustee had to defend against multiple unsuccessful attacks on the court-approved settlement should not be held against Counsel. As with the litigation against Star Trust and the AIM Entities, defense of the settlement was the only means to ensure that the estate would realize any benefit from the State Farm litigation.

Similarly, Debtor's objection that Trustee is not entitled to any fees because Counsel failed to exercise good billing judgment and settled a large claim for too little is overruled. Trustee conducted a reasonable investigation to determine the value of the claim against State Farm. Judge Efremsky ruled that the $30,000 settlement was fair and equitable, and both the BAP and the Ninth Circuit upheld that ruling. The Court has made appropriate reductions for Counsel's excessive time.

### D. *Trustee's Objection to Debtor's Discharge*

Three months after her appointment as chapter 7 trustee, Trustee filed an adversary proceeding to deny Debtor's discharge ("727 Action"). Trustee's complaint alleged that Debtor either concealed, destroyed, falsified or failed to keep adequate books and records from which his affairs could be ascertained. *See* 11 U.S.C. § 727(a)(3). Counsel seeks $27,526 for work related to the 727 Action, and as mentioned above, Accountant seeks $9,462.

Debtor and Attorney Levin ask that the Court disallow all professional fees related to the 727 Action – whether charged by Counsel or Accountant. Attorney Levin asserts that Debtor defeated Trustee's 727 Action at trial by a simple explanation that Debtor's records were lost due to Debtor's incarceration and movement between prison facilities before and during Debtor's bankruptcy case. Based on that result, Attorney Levin contends that the 727 Action had no value for the estate that could support either Counel's or Accountant's fee requests. Similarly, Debtor asserts that the fact that Counsel lost at trial against an incarcerated *pro se* debtor who could only participate for 15 minutes via telephone, demonstrates that Trustee's case lacked merit. As a result, Debtor

1  contends that $27,526.50 in fees constitutes a failure of Counsel's billing judgment to the detriment of

2  the bankruptcy estate.

3          The Court asked Counsel to provide additional information regarding the benefits that

4  Trustee anticipated from the 727 Action and legal authority concerning the appropriate standard for

5  evaluating professional fees related to the 727 Action because, as the Court noted, an objection to

6  discharge may not benefit the estate in the usual sense of bringing dollars to the estate. Having

7  reviewed the parties' supplemental submissions, the Court finds as follows.

8          Under the Bankruptcy Code, chapter 7 trustees have an express statutory duty to challenge a

9  debtor's right to receive a discharge, "if advisable." *See* 11 U.S.C. § 704(a)(6); *In re Hugues*, 2006

10  WL 3590253, at *2 (Bankr. D. Idaho, Dec. 8, 2006)(Pappas, J.). As one treatise explains, this duty is

11  imposed on trustees in their capacity as a representative of the estate and, as a result, the duty to

12  oppose discharge should be predicated on whether it will be of substantial benefit to the unsecured

13  creditors holding dischargeable debts. 4 NORTON BANKRUPTCY LAW AND PRACTICE § 77:17 (3rd ed.

14  2008). In deciding whether an objection to discharge will be of substantial benefit, and therefore

15  advisable, the treatise identifies three general factors that trustees should evaluate : 1) whether

16  grounds to object under § 727 exist; 2) whether any creditor has objected to discharge and the

17  probable outcome; and 3) whether creditors will be substantially benefitted by continuing a debtor's

18  liability for pre-petition debt. *Id.* If an objection to discharge is advisable, then the assistance of

19  attorneys or accountants with respect to the discharge litigation is authorized as necessary to carry out

20  the trustee's statutory duties under § 327(a) of the Bankruptcy Code and § 330(a) authorizes

21  reasonable compensation for actual necessary services. *Hugues*, 2006 WL 3590253, at *1.

22  Reasonableness of the compensation is determined under the factors set forth in § 330(a) of the

23  Bankruptcy Code. *Id.* at *2.

24          In *Hugues*, a chapter 7 trustee filed an adversary proceeding to revoke debtors' discharge

25  alleging fraud and willful failure to disclose a valuable asset – a horse trailer. Although the court

26  refused to revoke the discharge because the trustee had not demonstrated any intent to defraud, the

27  court subsequently awarded trustee's counsel $2,400 in fees and $193 in expenses related to the

28  adversary proceeding. The court noted that the action had been advisable because the trustee had

reason to believe that debtors had not properly disclosed an asset, which the trustee ultimately

1   liquidated for $12,000 for the benefit of the unsecured creditor. As a result, the court concluded that
2   counsel's fees related to the discharge litigation were necessary to carry out the trustee's statutory
3   duties. The court then applied the non-exclusive list of factors set forth in § 330(a)(3) to find that the
4   requested compensation was reasonable. *Id.*

5           Here, unlike *Hugues*, the Trustee has not identified any particular assets that Trustee sought
6   to recover via the 727Action. Nevertheless, Counsel states that Trustee, Counsel and Accountant all
7   believed that Debtor's claims of poverty were a ruse to allow Debtor to hide assets. As discussed
8   above, Debtor had a history of deceit. Moreover, according to Counsel, at the time the case
9   converted to chapter 7, there was evidence indicating that Debtor continued to maintain a residence
10  in Egypt and, while free on bail, Debtor had been arrested in an airport parking lot with $40,000 in
11  cash and a substitute passport. *See* Davis Decl. dated Apr. 23, 2012 at ¶ 3. Counsel explains that
12  Debtor's financial affairs were complex. Debtor had controlled millions of dollars flowing through
13  multiple individuals and entities. That complexity, when weighed against the relative dearth of
14  documentation, raised questions in the minds of Counsel and Trustee as to whether Debtor had
15  adequately maintained records, and Counsel believed that Debtor would produce records if faced
16  with a loss of his discharge. This was enough to provide a reasoned basis for a claim under
17  § 727(a)(3) for concealment of, or failure to keep, records. Additionally, no other creditor had
18  objected to discharge and, as Counsel advised at the hearing on these fee applications, the UST had
19  asked Trustee to file the 727Action. Finally, even though no particular undisclosed assets had been
20  identified, Debtor's history of wealth and untruthfulness gave Trustee a basis for believing that, if
21  Debtor's records were produced, it was likely that additional assets would be exposed and could be
22  liquidated for the benefit of Debtor's creditors. The Court finds these circumstances sufficient to
23  render the filing of the 727 Action "advisable."

24          However, the Court is not persuaded that the substantial amount of fees incurred for
25  prosecution of the 727 Action through trial was reasonable. Counsel insists that neither Debtor nor
26  Attorney Levin raised the notion that any documents were lost until Debtor made that claim at trial in
27  September 2007. But there is also no evidence that Counsel asked enough questions to rule out lost
28  documents during the discovery process. Despite Counsel's knowledge that Debtor was incarcerated
    and that Debtor's home had been foreclosed during that incarceration, Counsel appears to have relied

1  on general statements of Debtor, Debtor's son and Attorney Levin regarding the location of

2  "remaining" or "available" records, without following up to determine whether those remaining and

3  available documents constituted the universe of records that had ever existed. Counsel could have

4  posed that question to Debtor by way of deposition, but did not. While Debtor initially was not

5  available for deposition due to the pending criminal proceedings, Counsel concedes that by May

6  2007, Counsel was aware that the criminal proceeding had ended after Debtor was convicted in

7  January 2007. As a result, Counsel could have sought Debtor's deposition following Judge

8  Efremsky's denial of the parties' cross- motions for summary judgment on May 3, 2007. Instead,

9  Counsel issued a fourth request for production of documents to Debtor on May 11, 2007 and began

10 to prepare for trial. Counsel's explanation for relying on multiple rounds of written discovery is not

11 convincing. Counsel states that "[g]iven Mohsen's arrest for attempting to hire an assassin to kill a

12 District Court Judge, I was leery of having any face to face contact with Mohsen." Davis Supp.

13 Decl. dated Dec. 14, 2011 at ¶ 3. Yet, Debtor was incarcerated, so any deposition would have

14 proceeded in a secure environment. Further, Counsel had already sent another lawyer from

15 Counsel's firm to attend the 2006 deposition of Debtor in connection with the State Farm litigation

16 without adverse consequences.

17      Based on Counsel's time records, Counsel incurred about $7,500 in fees up through the

18 parties' cross-motions for summary judgment in the 727 Action. This included preparing three

19 rounds of interrogatories and production requests to Debtor, responding to Debtor's discovery,

20 engaging Accountant to prepare Accountant's expert report regarding Debtor's finances, preparing

21 Trustee's motion for summary judgment and responding to Debtor's motion for summary judgment.

22 The Court finds the fees up through that point, including the preparation of Accountant's expert

23 report, fall within the range of what was reasonable under the circumstances.

24      However, once summary judgment was denied, it was ill advised to incur another $20,000

25 in fees to proceed to trial based on the lack of adequate records. By May 2007, the use of the 727

26 Action to encourage Debtor to produce records under threat of losing his right to a discharge was

27 unrealistic. Debtor did not produce documents despite the potential for summary judgment against

28 Debtor. Moreover, based on Debtor's earlier request for dismissal of this Case, Debtor does not

appear to have been concerned with receiving a discharge. If the records were in fact non-existent,

Case: 05-50062   Doc# 3   Filed: 06/09/12   Entered: 06/13/12 10:52:55   Page 24 of
28      24

1  then there was nothing that would help uncover any assets; and even if Trustee was able to establish

2  that Debtor concealed, destroyed, falsified or failed to keep adequate books and records, the denial of

3  Debtor's discharge alone was unlikely to provide a substantial benefit for creditors because Debtor

4  was, and still is, incarcerated with little to no income while serving out a seventeen year sentence.

5      All of these factors differentiate this Case from *Hugues* where the court found the action to

6  revoke discharge to be "advisable." Based on the record before this Court, by the time the cross-

7  motions for summary judgment was denied, it was apparent that the 727 Action was not likely to

8  substantially benefit creditors and, as a result, the Court concludes that after May 2007, continued

9  prosecution of the 727 Action cannot be said to have been "advisable," nor were additional fees

10  reasonable. As a result, the Court reduces Counsel's fees in this category by $20,000. Accountant's

11  fees related to the expert report related to the 727 Action were incurred prior to the summary

12  judgment motions and will be allowed in full.

13

14      **E.** ***Fees Related to Asset Identification***

15      Both Debtor and Attorney Levin request that this Court disallow in full the $5,415 in fees

16  for the Asset Identification project category on the grounds that these fees are for work that is part of

17  Trustee's ordinary duties and because the services in this project category were both unnecessary and

18  not reasonably likely to benefit the bankruptcy estate under *Mednet*. Debtor asserts that Debtor

19  described all material assets in Debtor's bankruptcy schedules. Debtor also asserts that the efforts of

20  Counsel to trace and pursue assets of corporations partly owned by Debtor was contrary to more than

21  a century of corporate law under *U.S. v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010). Debtor

22  further objects on the ground that the work performed by Counsel to determine the whether the

23  property in Cairo was able to be sold was unnecessary because that activity was Trustee's

24  administrative obligation. Lastly, Debtor asserts that the $68,407 recovered from Cadence does not

25  belong to the bankruptcy estate, but rather belongs to the AIM Entities, and Debtor's appeal from the

26  court's default judgment against the AIM Entities is on appeal to the Ninth Circuit.

27      The Court has reviewed the itemization of services rendered in the Asset Identification

28  project category and finds that the services fall within the domain of compensable legal services.

Counsel billed time to communications with the lawyer for Debtor's son related to documents

1 located in a storage facility and the son's Rule 2004 examination. Counsel also worked with

2 Accountant regarding the review and investigation of the records in the storage facility. Counsel

3 prepared and served third party subpoenas and had follow-up telephone conversations with the

4 subpoena recipients. Counsel conducted a Rule 2004 examination of Debtor's son. Finally, Counsel

5 communicated with Trustee concerning the abandonment of certain property in Egypt, prepared a

6 related notice and motion to abandon and prepared an application for relief by default.

7        All of these tasks are well within the type of services that counsel for a trustee would

8 typically render. They are not ordinarily part of a trustee's administrative duties. The objections that

9 the work described in the Asset Identification Category was part of Trustee's ordinary duties is

10 overruled.

11        Debtor continues to contest whether assets that Trustee identified and recovered properly

12 belong to the estate. Although Debtor has taken an appeal from the court's default judgment against

13 the AIM Entities, there has been no showing that Counsel's services reflected in the Asset

14 Identification category could be characterized as unnecessary or unreasonable. As a result, Debtor's

15 objection to the asset identification fees based on Debtor's perceived lack of merit to Trustee's

16 claims against the AIM Entities is overruled. The $5,415 in fees in the Asset Identification category

17 are allowed.

18

19      **F.**     ***Counsel's Miscellaneous Project Category***

20        Finally, Attorney Levin asks the Court to disallow $8,176 in fees for the miscellaneous

21 tasks on the grounds that these fees are for work that is part of Trustee's ordinary duties. Attorney

22 Levin is mistaken. In the Miscellaneous project category, Counsel reviewed Debtor's schedules and

23 statement of affairs, prepared an employment application, engaged in communications with Trustee

24 to keep Trustee current on status of pending matters, reviewed documents received from Attorney

25 Levin, reviewed and responded to multiple motions that Debtor filed, reviewed hearing transcripts,

26 attended hearings, prepared orders following hearings, and prepared status reports. All of these

27 activities fall within the domain of legal counsel. The only specific tasks that Attorney Levin has

28 challenged are entries for time spent "reviewing the debtor's Statement of Financial Affairs,

     Schedules and other documents and reviewing the Chapter 11 pleadings in the case and conferring

1 with representatives of the United States Trust [sic] and of the debtor." In December 2005, at the

2 beginning of Counsel's appointment, Counsel billed one half hour to review Debtor's schedules, in

3 addition to preparing Counsel's employment application. This brief review of the petition was

4 entirely reasonable and necessary to acquaint counsel with the case. In that same December 2005

5 time frame, Counsel spent .6 hours on three separate telephone conversations with Trustee and two

6 representatives from the office of the United States Trustee. These conversations to familiarize

7 Counsel with the case were well within the bounds of reason. Attorney Levin's objection to the time

8 billed in the Miscellaneous project category is overruled and those fees will be allowed in full.

### CONCLUSION

For the reasons stated above, the Court overrules all objections to the final account and fee

application of Trustee; both are approved as filed. The final fee application of Accountant is allowed

in the amount requested, $36,562 for fees and $115.62 for expenses. After application of the

$10,000 interim award that Accountant received, Accountant is entitled to receive $26,677.62 in

additional funds. The final fee application of Counsel is approved in the amount of $102,226.50 for

fees and $11,172.73 for expenses. After application of the $72,650.62 interim award that Counsel

received, Counsel is entitled to receive $40,748.61 in additional funds. Counsel for Trustee shall

submit a form of order after service on Attorney Levin and Debtor.

Dated: June 9, 2012

ARTHUR S. WEISSBRODT
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Case No. 05-50662

2

3

4                                     **Court Service List**

5

6  Chapter 7 Trustee
   Carol Wu
7  25A Crescent Dr. #413
   Pleasant Hill, CA 94523

8

9  Richard Pierotti
   KOKJER, PIEROTTI, MAIOCCO & DUCK
   351 California Street, Suite 300
10 San Francisco, CA 94104

11

12 Dennis D. Davis
   GOLDBERG, STINNETT, DAVIS AND LINCHEY
   44 Montgomery St. #850
13 San Francisco, CA 94104

14

15 David S. Levin
   LEVIN LAW FIRM
   405 Sherman Ave.
16 Palo Alto, CA 94306

17

18 Amr Mohsen
   No. 92949-011
   US Penitentiary
19 3901 Klein Boulevard
   Lompoc, CA 93436

20

21 Amr Mohsen
   No. 92949-011
   Federal Correctional Inst.
22 P.O. Box 9000
   Safford, AZ 85548-9000

23

24 Office of the U.S. Trustee
   U.S. Federal Bldg.
25 280 S 1st St. #268
   San Jose, CA 95113-3004

26

27

28